[Cite as *State v. Morris*, 2018-Ohio-5252.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-208<br>(C.P.C. No. 16CR-2290) |
| | | **and** |
| v. | : | No. 18AP-209<br>(C.P.C. No. 16CR-6205) |
| Terrance Morris, | : | |
| | | **(REGULAR CALENDAR)** |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 27, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee.

**On brief:** *Sydow Leis LLC*, and *Anastasia L. Sydow*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Terrance Morris, appeals from two judgment entries of the Franklin County Court of Common Pleas finding him guilty pursuant to guilty verdicts of two counts of rape, six counts of unlawful conduct with a minor, and four counts of importuning. For the following reasons, we affirm.

I. Facts and Procedural History

{¶ 2} By indictment filed April 26, 2016, plaintiff-appellee, State of Ohio, charged Morris, under Franklin C.P. No. 16CR-2290, with four counts of importuning in violation of R.C. 2907.07, all fifth-degree felonies; and four counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04, third-degree felonies. All eight charges related to

Morris' conduct with A.P., who was 15 years old at the time. Morris entered a plea of not guilty.

{¶ 3} Subsequently, by indictment filed November 4, 2016, the state charged Morris, under Franklin C.P. No. 16CR-6205, with two counts of rape in violation of R.C. 2907.02, first-degree felonies; and two counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04, third-degree felonies. The charges in this indictment related to Morris' conduct with J.H., a minor. Morris again entered a plea of not guilty.

{¶ 4} On February 22, 2017, the state filed a motion to join Morris' two indictments into a single action for trial. Morris opposed the state's motion for joinder. The trial court conducted a hearing on the state's motion on March 15, 2017. Following the hearing, the trial court issued an entry granting the state's motion for joinder. The trial court reasoned that because "evidence of one offense would be admissible at a separate trial as other acts evidence" under Evid.R. 404(B), and because Morris did not establish prejudice would result from having the indictments joined together, joinder was in the interest of judicial economy. (No. 18AP-209, May 17, 2017 Entry Granting Joinder at 3.)

{¶ 5} The matter then proceeded to a joint jury trial on both indictments beginning January 29, 2018. A.P., who was 17 years old at the time of trial, testified that she used to dance on a dance team through the Barnett Recreation Center. The head coach of the dance team was LaTausha Woods, and Morris was an assistant coach. A.P. testified she first met Morris at dance tryouts in August 2015 when she was 14 years old. A.P. turned 15 years old on August 29, 2015, and she testified that Morris told her he was 28 years old.

{¶ 6} Pursuant to her testimony, A.P. told Morris she thought he was cute and had a crush on him, and Morris obtained A.P.'s phone number from another girl on the dance team. A.P. said she and Morris would text every day and that their relationship turned "serious." (No. 18AP-208, Tr. Vol. I at 33.) A.P. told Morris how old she was and Morris told her that he "was okay with it." (Tr. Vol. I at 33.) After they made their relationship "official," A.P. said Morris told her not to tell anyone that he was her boyfriend because they could get in trouble, including A.P. getting kicked off the dance team.

{¶ 7} A.P. testified that she would spend time with Morris at her house, at restaurants, and at a park. However, A.P. said her mother did not know she was spending time with Morris because her mom was at work when A.P. was with Morris. Eventually,

A.P. said she and Morris started having sex.  A.P. testified she and Morris had vaginal intercourse, she would perform oral sex on Morris, and Morris would perform oral sex on her.  Additionally, A.P. said she and Morris did not use protection when they had intercourse because Morris "said he knew what he was doing so [she] trusted him."  (Tr. Vol. I at 40.)

{¶ 8}  A.P. testified that she had sex with Morris "a lot" but that she stopped once her mom found out about their relationship.  (Tr. Vol. I at 40.)  A.P. said her mom saw text messages and pictures on her phone that she and Morris had been sending to each other and confronted A.P. about them.  At first, A.P. said she lied to her mom about having a relationship with Morris because she was "scared."  (Tr. Vol. I at 44.)

{¶ 9}  Eventually, however, A.P. said her mom had her go to Nationwide Children's Hospital ("Children's Hospital") to be examined.  While at Children's Hospital, A.P. met with a detective who had her call Morris in a controlled phone call.  During the phone call, which the state played the recording of in court, Morris admitted to having sex with A.P. but said no one would be able to prove it because he didn't ejaculate inside of her.

{¶ 10} Kerri Wilkinson, a forensic interviewer at Children's Hospital, testified she interviewed A.P. on January 15, 2016.  Wilkinson testified A.P. told her that Morris, her dance instructor, had asked to be her boyfriend but told her not to tell anyone.  A.P. told Wilkinson during the interview that she had intercourse with Morris more than once, that they did not use protection, and that Morris would not ejaculate inside of her when they had sex.  Additionally, A.P. disclosed to Wilkinson that she engaged in oral sex with Morris and other sexual contact including Morris touching her breasts and her genitals.  Wilkinson further testified that A.P. told her about various sexual acts Morris would ask A.P. to perform on him.

{¶ 11} Megan Letson, a physician at Children's Hospital, testified she examined A.P. on January 15, 2016.  Dr. Letson testified A.P. had no physical injuries. Dr. Letson said A.P.'s physical exam was consistent with the history A.P. had provided.

{¶ 12} J.H., who was 16 years old at the time of trial, testified that she met Morris when she was 12 or 13 years old because he was the assistant coach of her dance team.  J.H. said she obtained Morris' phone number on a messenger app and sent him a text message to ask about how she could be a better captain for the dance team.  Thereafter, J.H. said she

continued to text and talk with Morris for about one year. She said at one point, when she was 14 years old, she confessed to Morris that she had a crush on him. Morris responded by saying he had similar feelings for J.H. but that they should keep their feelings discreet.

{¶ 13} J.H. said she told three people about being Morris' girlfriend and that Morris "got mad" and told her she needed to keep quiet because he could "get in serious trouble." (Tr. Vol. I at 79-80.) J.H. then told the three people that she was joking about being Morris' girlfriend, but she said she and Morris would continue to text as though they were in a relationship. J.H. testified she knew it was wrong to communicate with Morris in this way, but she felt like she could not stop because "being the captain of [the dance] team meant so much" to her. (Tr. Vol. I at 79.)

{¶ 14} J.H. also said she would often spend the night at Woods' house, the head coach of the dance team, the night before competitions along with other members of the dance team. J.H. said Morris would be present at these sleepovers and would "mess with [her]" and "act[ ] like he was playing." (Tr. Vol. I at 83.)

{¶ 15} During one sleepover on "the day going into New Year's," J.H. testified that Morris raped her. (Tr. Vol. I at 83.) Specifically, J.H. testified she was lying on the couch when Morris climbed over her. J.H. testified she tried to get away from him and tried to "fight him" but that Morris pulled her back and anally raped her. (Tr. Vol. I at 85.) J.H. said it was painful but said she did not scream because Morris had his hand covering her mouth. At one point, J.H. said Morris partially removed himself and tried to reposition himself, but J.H. was able to push Morris off of herself and run to the bathroom. J.H. testified she locked herself in the bathroom, she was bleeding, and she waited in the bathroom long enough until she felt she was strong enough to "mentally fight him back" if Morris came after her again. (Tr. Vol. I at 86.)

{¶ 16} The next morning, J.H. testified she came downstairs and was "walking really weird" because her body "was hurting." (Tr. Vol. I at 87.) J.H. said Morris told her that if she does "some stretches, that pain will go away." (Tr. Vol. I at 87-88.) J.H. testified that Morris' comment left her feeling very angry. However, J.H. testified she did not tell her parents about being raped because she did not know what they were going to do and was not even sure they would believe her.

{¶ 17} J.H. further testified that Morris raped her a second time during another sleepover at Woods' house early in the spring. At this sleepover, J.H. said there were a lot of people there and Morris moved all of J.H.'s belongings into a corner. After falling asleep in that corner, J.H. said Morris woke her up and "the same thing happened again." (Tr. Vol. I at 90.)

{¶ 18} J.H. testified when Morris woke her up, she thought to herself about whether she should just "let this happen" or whether she could "fight back," but she said it was "too late." (Tr. Vol. I at 90-91.) J.H. testified Morris anally raped her again, and the experience was once again painful but she did not scream. After it was over, J.H. said she just sat in the corner because she could not sleep. The next morning, J.H. decided she would not attend any more sleepovers at Woods' house.

{¶ 19} Between these two encounters, J.H. said Morris continued to contact her and would act like nothing wrong had happened. She testified that if she did not do what Morris wanted or tried to cut off contact with him, Morris would threaten that he would take away her captain position.

{¶ 20} Eventually, J.H. said another member of the dance team suspected something was going on between J.H. and Morris, so there was a meeting at Woods' house that included J.H., her parents, Morris, Woods, and a few other people. J.H. testified that before the meeting, Morris called her and told her she needed to go to the meeting and say she had a crush on Morris and that she did not mean for it to go this far but that she was sorry. J.H. said Morris told her that if she said what he wanted her to say, it would keep them both from getting in trouble. J.H. testified she said everything Morris told her to say during the meeting, and she said she lied at the meeting because she did not think anyone was going to believe her. After the meeting, J.H. said her mom took her off the dance team.

{¶ 21} J.H. testified she ultimately decided to tell the truth because "it was eating [her] up so much." (Tr. Vol. I at 97.) She said she was so distraught that her hair was falling out and she was having suicidal thoughts. When she finally came forward with what happened to her, J.H. went to the Children's Advocacy Center at Children's Hospital for an examination in May 2016.

{¶ 22} B.H., J.H.'s mother, testified that J.H. used to regularly go to Woods' house before competitions, but she did not know that Morris would also be staying at the house

on those nights.  B.H. testified that she learned on May 1, 2016 that J.H. had been sexually assaulted.  This information prompted B.H. to contact a detective and make an appointment for J.H. with a doctor.  She also said there were some indications that something was going on with J.H. and Morris, including messages sent through Facebook and "inappropriate conversations."  (Tr. Vol. II at 141.)  B.H. said that after J.H. came forward about being raped, J.H. has had to change schools, has been bullied on social media, and has contemplated suicide.

{¶ 23}  Wilkinson, the forensic interviewer at Children's Hospital, testified she also interviewed J.H. on May 10, 2016 when J.H. was 15 years old.  Wilkinson testified that J.H. told her the situation with Morris began one year earlier and that Morris was her dance instructor.  J.H. disclosed to Wilkinson that Morris had twice performed anal sex on her while at Woods' house and that it hurt both times.  J.H. also told Wilkinson that Morris had told J.H. not to tell anyone about their relationship, told her to lie for him, and told her they could both get in trouble if anyone found out about their relationship.

{¶ 24}  Farah Brink, a physician with Children's Hospital, testified that she examined J.H.  Dr. Brink testified that J.H. reported some past suicidal ideation.  J.H.'s physical anogenital exam was normal, but Dr. Brink testified this was consistent with a history of anal penetration.  Additionally, Dr. Brink testified she sees delayed disclosure of sexual assault frequently, especially with children.

{¶ 25}  The parties stipulated that Morris' date of birth was April 29, 1987.  After the state rested its presentation of evidence, Morris made a Crim.R. 29 motion for acquittal specific to the importuning counts related to A.P.  The trial court denied the Crim.R. 29 motion.

{¶ 26}  Morris presented four witness in his defense.  A.N., the mother of Z.W., testified that she attended the meeting concerning J.H. and Morris and that she thought J.H. apologized during the meeting for lying about her relationship with Morris.  Z.W., who was on the same dance team and was friends with A.P. and J.H., testified she did not believe A.P. had sexual intercourse with Morris, and she did not want to see Morris get in trouble.  Revieta Lampley testified she was also at the meeting, and she recalled J.H. saying she had a crush on Morris.

{¶ 27} Finally, Woods testified that she coached both A.P. and J.H. but the two girls were never on the team at the same time. Woods said she had never seen any inappropriate behavior from Morris. After the meeting, Woods said she suspended J.H. from being the captain of the dance team. Woods testified she distanced herself from Morris in case the allegations were true, but she said she was still unsure what the truth was.

{¶ 28} After calling those four witnesses, the defense rested and Morris renewed his Crim.R. 29 motion for acquittal. The trial court again denied Morris' Crim.R. 29 motion.

{¶ 29} During the jury's deliberations, the trial court learned that the jury had been given a CD that contained recordings that were not presented as evidence. The trial court contacted counsel and stated it was going to bring the jurors in to have the jurors explain "what they had an opportunity to listen to." (Tr. Vol. IV at 473.) After questioning the jurors and hearing arguments from counsel, the trial court denied Morris' motion for a mistrial. Additionally, the trial court provided a curative instruction to the jury.

{¶ 30} Following deliberations, the jury returned guilty verdicts on all counts. Following a March 7, 2018 sentencing hearing, the trial court sentenced Morris to an aggregate prison term of 16 and one-half years. The trial court journalized Morris' convictions and sentence in two judgment entries dated March 19, 2018, one for each of the underlying indictments. Morris timely appeals from both judgment entries. This court sua sponte consolidated the cases for purposes of appeal.

## II. Assignments of Error

{¶ 31} Morris assigns the following errors for our review:

[1.] The trial court erred when it granted the state's motion for joinder.

[2.] The trial court erred in denying defendant's motion for a mistrial after evidence not admitted at trial went back to the jury room and was viewed by jurors during deliberations.

[3.] The verdicts were against the manifest weight of the evidence.

[4.] The trial court erred when it overruled appellant's motion for acquittal pursuant to Criminal Rule 29.

### III.  First Assignment of Error – Joinder

{¶ 32} In his first assignment of error, Morris argues the trial court erred when it granted the state's motion for joinder.

{¶ 33} Generally, the law favors the joinder of multiple offenses into a single trial. *State v. McBride*, 10th Dist. No. 10AP-585, 2011-Ohio-1490, ¶ 9, citing *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 28.  Under Crim.R. 13, "[t]he court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information."  Even where two indictments are properly joined together, a defendant may move for severance pursuant to Crim.R. 14.  "If it appears that a defendant or the state is prejudiced by a joinder of offenses * * * by such joinder for trial together of indictments, * * * the court shall order an election or separate trial of counts."  Crim.R. 14.

{¶ 34} Ordinarily, an appellate court reviews a trial court's decision on joinder for an abuse of discretion.  *State v. Berry*, 10th Dist. No. 16AP-659, 2017-Ohio-1529, ¶ 54. Here, Morris opposed the state's motion for joinder prior to trial.  However, Morris did not renew his opposition to the joinder of his indictments either at the close of the prosecution's case, at the conclusion of all evidence at trial, or otherwise move for severance under Crim.R. 14 during the trial.  Under these circumstances, Morris has forfeited all but plain error.  *Berry* at ¶ 54 (where the opposition to joinder was not renewed at trial, an appellate court reviews only for plain error), citing *State v. Cameron*, 10th Dist. No. 09AP-56, 2009-Ohio-6479, ¶ 37 ("[a] defendant forfeits a joinder issue by not renewing an objection to joinder at the close of the prosecution's case or at the conclusion of all evidence at trial"); *State v. Burks*, 10th Dist. No. 07AP-553, 2008-Ohio-2463, ¶ 50 ("even construing appellant's objection to the joinder as a Crim.R. 14 severance request, we note that appellant forfeited all but plain error on the Crim.R. 14 severance issue because, at the close of appellee's case-in-chief or at the conclusion of all evidence at trial, appellant did not renew an objection to the trial court's failure to sever the trial").  An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice.  *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 35} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 36} While Crim.R.14 permits a trial court to sever the trial of multiple offenses, it may do so only if the defendant can affirmatively demonstrate prejudice stemming from a joint trial. *Burks* at ¶ 51, citing *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). Morris argues he suffered prejudice from the joint trial because the testimony of each victim was unrelated to the other victim and having the two indictments tried together had the effect of bolstering the testimony of each victim. Further, Morris asserts the state impermissibly used the testimony of each victim in an attempt to show Morris had a propensity to commit sexual offenses against minor victims. *See* Evid.R. 404(B). Morris argues allowing the testimony of both victims to be heard in a joint trial was especially prejudicial to him because the issue at trial was one of victim credibility, not one of identity.

{¶ 37} As this court has previously noted, "[t]he state can negate the defendant's claims of prejudice in two ways." *Cameron* at ¶ 35, citing *Brinkley* at ¶ 30. "First, if evidence of one offense could have been introduced under Evid.R. 404(B) at the trial of the other offense, no prejudice could have resulted from joinder." *Cameron* at ¶ 35, citing *Brinkley* at ¶ 30. "Second, prejudice is refuted if the evidence of the offenses joined at trial is simple and direct." *Cameron* at ¶ 35, citing *Brinkley* at ¶ 30. "These two tests are disjunctive and need not be satisfied together to negate a claim of prejudicial joinder." *Cameron* at ¶ 35, citing *State v. Mills*, 62 Ohio St.3d 357, 362 (1992).

{¶ 38} Morris' argument that the state impermissibly used the evidence of the other offenses to show propensity ignores the trial court's conclusion following the hearing on the state's motion for joinder that the testimony of each victim would be admissible under Evid.R. 404(B), not to show propensity, but to show things like motive, intent, plan, or scheme. *See State v. Shook*, 3d Dist. No. 8-14-01, 2014-Ohio-3987, ¶ 27, citing *State v. Stober*, 3d Dist. No. 12-13-09, 2014-Ohio-1568, ¶ 102 (testimony of multiple victims of a teacher having sexual contact with students could have been admissible in separate trials

under Evid.R. 404(B) "to show motive, intent, plan, or scheme"). The victims were of similar age and were both pupils under Morris' instruction on the dance team.

{¶ 39} Moreover, the trial court additionally concluded that the evidence of the offenses under each indictment was simple and direct. "[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *State v. Lott*, 51 Ohio St.3d 160, 163 (1990); *State v. Hillman*, 10th Dist. No. 14AP-252, 2014-Ohio-5760, ¶ 39. "Evidence is simple and direct if the jury is capable of segregating the proof required for each offense." *Cameron* at ¶ 40, citing *Mills* at 362.

{¶ 40} Here, the state's evidence related to the two indictments was not confusing or difficult to follow. The state presented a limited number of witnesses who presented straightforward testimony. Additionally, the trial court instructed the jury regarding the admissibility and purpose of the testimony of each victim as it related to the other victim's allegations. *See Hillman* at ¶ 40 (concluding that "because the evidence was simple and direct, the possibility of jury confusion was extremely remote such that any claim of prejudice arising from joinder would be negated"), citing *State v. Wilson*, 10th Dist. No. 10AP-251, 2011-Ohio-430, ¶ 25 ("[a] jury is presumed to follow the instructions of the court").

{¶ 41} For these reasons, we conclude Morris has failed to demonstrate plain error from the trial court's joinder of the two indictments for trial. Accordingly, we overrule Morris' first assignment of error.

## IV. Second Assignment of Error – Motion for Mistrial

{¶ 42} In his second assignment of error, Morris argues the trial court erred when it denied his motion for a mistrial. More specifically, Morris asserts it was an abuse of discretion for the trial court not to declare a mistrial when the jury revealed during deliberations that it had erroneously received a CD containing audio recordings that were not presented as evidence during the trial.

{¶ 43} An appellate court reviewing a trial court's decision on a motion for mistrial defers to the judgment of the trial court, as it is in the best position to determine whether circumstances warrant a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Thus, we review a trial court's decision for an abuse of discretion. *Columbus v. Aleshire*, 187 Ohio

App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987). An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 44} " 'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected.' " *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 52, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist.1988). Instead, a trial court should only declare a mistrial when "the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). In determining whether a defendant was deprived of a fair trial, we must determine whether, absent the error or irregularity, "the jury would have found the appellant guilty beyond a reasonable doubt." *Aleshire* at ¶ 42, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984). To determine whether the alleged misconduct resulted in prejudice, we must consider (1) the nature of the error, (2) whether an objection was made, (3) whether the trial court provided corrective instructions, and (4) the strength of the evidence against the defendant. *Aleshire* at ¶ 42, citing *State v. Tyler*, 10th Dist. No. 05AP-989, 2006-Ohio-6896, ¶ 20.

{¶ 45} This court has held that an item not admitted into evidence but taken into deliberations does not require a reversal if the item "could not have been prejudicial." *State v. Smith*, 10th Dist. No. 13AP-973, 2015-Ohio-735, ¶ 29, citing *State v. Graven*, 52 Ohio St.2d 112, 114 (1977). During deliberations, the jury submitted a question to the trial court inquiring whether it was meant to listen to the entire contents of an audio CD or whether they were to listen only to certain portions of the CD reflecting those exhibits actually admitted into evidence. The CD contained three files, only one of which had been admitted into evidence. The other two files were recordings of police interviews with witnesses not called at trial.

{¶ 46} The trial court questioned the jury about what they heard on the CD. The jury foreperson told the court that the only thing of substance they heard was a detective say "I was going to conduct an interview. I know it's not going to be comfortable." (Tr. Vol. IV at 475.) The rest of the time it was just dead air or background noise. According to the foreperson, the jury stopped listening at that point. After denying Morris' motion for mistrial, the trial court instructed the jury that it should only consider the evidence

admitted at trial and "[a]nything else that you've listened to, again, as you described to me in the courtroom, is not evidence and should not be considered for any purpose whatsoever in this case." (Tr. Vol. IV at 484.) Because the jury did not hear anything of substance related to the issues of the case on the CD and because the trial court provided an appropriate curative instruction to disregard anything the jury may have heard on the CD that was not evidence, Morris is unable to demonstrate prejudice resulting from the submission of the CD to the jury. *Walburg* at ¶ 53 (trial court did not err in denying defendant's motion for mistrial where the trial court provided an appropriate curative instruction to the jury to completely disregard the question and answer, noting the jury is presumed to have followed the trial court's instruction), citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 39.

{¶ 47} Thus, the trial court did not abuse its discretion in denying Morris' motion for a mistrial. Accordingly, we overrule Morris' second assignment of error.

## V. Third Assignment of Error – Manifest Weight of the Evidence

{¶ 48} In his third assignment of error, Morris argues his convictions are against the manifest weight of the evidence.

{¶ 49} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 50} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine

whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 51} The entirety of Morris' manifest weight of the evidence argument is that the victims' testimony lacked credibility. Morris asserts that because the testimony of J.H. and A.P. contained inconsistencies, the jury clearly lost its way in believing J.H. and A.P. However, the presence of conflicting evidence does not render a verdict against the manifest weight of the evidence. *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43, citing *Raver* at ¶ 21. Additionally, a conviction is not against the manifest weight of the evidence merely because the trier of fact believed the state's version of events over the defendant's version. *Lindsey* at ¶ 43, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. Despite Morris' assertion that J.H. and A.P. presented internally inconsistent testimony, we note that both J.H. and A.P. testified in great detail and Wilkinson, the forensic interviewer at Children's Hospital, corroborated J.H.'s and A.P.'s version of events. Additionally, in the controlled call between A.P. and Morris, Morris admits to a sexual relationship with A.P., undermining his argument that there was little evidence establishing he ever had sexual contact with either of the victims. Thus, in light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way in concluding Morris committed the offenses of rape, unlawful sexual conduct with a minor, and importuning.

{¶ 52} For these reasons, we conclude the manifest weight of the evidence supports Morris' convictions. Accordingly, we overrule Morris' third assignment of error.

## VI. Fourth Assignment of Error – Crim.R. 29 Motion for Acquittal

{¶ 53} In his fourth and final assignment of error, Morris argues the trial court erred in denying his Crim.R. 29 motion for acquittal.

{¶ 54} Crim.R. 29(A) provides that the court, "on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of judgment of

acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Review of the denial of a Crim.R. 29 motion and the sufficiency of the evidence apply the same standard. *State v. Fugate*, 10th Dist. No. 12AP-194, 2013-Ohio-79, ¶ 5, citing *State v. Turner*, 10th Dist. No. 04AP-364, 2004-Ohio-6609, ¶ 8. Whether there is legally sufficient evidence to sustain a verdict is a question of law. *Thompkins* at 386. Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 55} Rather than challenge the evidence related to any particular element of the charged offenses, Morris argues that there was insufficient evidence to sustain his convictions because the state failed to present corroborating evidence to support the testimony of A.P. and J.H. However, a victim's testimony, standing alone, constitutes sufficient evidence to support charges of sexual conduct. *State v. W.J.*, 10th Dist. No. 14AP-457, 2015-Ohio-2353, ¶ 35, citing *State v. Timmons*, 10th Dist. No. 13AP-1038, 2014-Ohio-3520, ¶ 23, citing *State v. Henderson*, 10th Dist. No. 10AP-1029, 2011-Ohio-4761, ¶ 17. Moreover, corroborating evidence is not required to prove the rape offenses. *W.J.* at ¶ 35, citing *Timmons* at ¶ 23, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 53 (noting "[c]orroboration of victim testimony in rape cases is not required").

{¶ 56} Moreover, to the extent Morris argues his convictions of importuning are against the manifest weight of the evidence because the state never introduced alleged text messages between A.P. and Morris purporting to show solicitation, we note that Wilkinson testified that A.P. told her about the various times Morris asked her to engage in different sexual acts with him. Thus, contrary to Morris' assertion, the state did present evidence that Morris solicited sexual contact from A.P. Accordingly, the state presented sufficient evidence of the offenses of rape, unlawful sexual conduct with a minor, and importuning, and the trial court did not err in overruling Morris' Crim.R. 29 motion for acquittal. We overrule Morris' fourth and final assignment of error.

## VII. Disposition

{¶ 57} Based on the foregoing reasons, the trial court did not err in granting the state's motion for joinder or in denying Morris' motion for a mistrial. Additionally, Morris' convictions are not against the manifest weight of the evidence, and the trial court did not err in denying Morris' Crim.R. 29 motion for acquittal. Having overruled Morris' four assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

SADLER and DORRIAN, JJ., concur.

_____